<hr />

## HULL *vs.* SULLIVAN.

1. Where a person having property for sale, such as land and a steam saw mill, agreed upon the price with one wishing to buy, but who could not consummate the purchase on his own account, because some of the security required belonged to his wife, and, thereupon, the hus-band induced his wife to become the purchaser through him, and the contract was thus consummated, the conveyance of the prop-erty being made directly to the wife, and she giving her notes and mortgage for the purchase money, the mortgage embracing not only the property then conveyed to her, but also other property consti-tuting her separate estate, she is bound as purchaser and mortgagor, if the seller and mortgagee committed no fraud upon her nor knew of any committed by the husband.

2. When a mortgage refers to a deed of conveyance between the same parties, and describes it as of even date with the mortgage, the mortgagor is chargeable with notice of the deed and its contents.

3. The husband has no right to use for his own benefit property which has been conveyed to his wife, and for which she has given her notes and mortgage ; but it is her province to see that she gets the fruits of its use, and no duty in that regard is cast by law upon the seller.

4. Can husband or wife be heard to testify to private conversations between themselves to defeat a contract made by either of them with a third person ?

5. On the facts in the record, and the law applicable thereto, the consideration for the mortgage moved to the wife, and not to the husband. The husband acquired no interest in the property for which the mortgage debt was created, nor did he become indebted to the seller therefor, either before the mortgage was executed or afterwards. The entire credit was given to the wife alone.

Husband and wife. Vendor and purchaser. Sales. Mortgage. Notice. Deeds. Witness. Evidence. Before Judge Tompkins. Chatham Superior Court. January Term, 1878.

Reported in the opinion.

John M. Guerard, for plaintiff in error, cited, on relation of married woman to her separate estate, Code, §§1754–1783 ; 59 *Ga.*, 380, 779. Husband acted as her agent, 55 *Ga.*, 406 ; 54 *Ib.*, 262. She permitted injury to Hull, and must suffer, 52 *Ga.*, 207 ; 60 *Ib.*, 39 ; Code, §§2634, 2635, 3172–3176. Mortgagee is purchaser for valuable consideration, 1st Rawle, 231 ; 3rd Grant's Cases, 28 ; 5 Ind., 396. Concealment by married woman is a fraud, 45 *Ga.*, 301 ; 52 *Ib.*, 205 ; 54 *Ib.*, 264, 614 ; 60 *Ib.*, 42, 189. Hull had no notice, 51 *Ga.*, 15, 295 ; 56 *Ib.*, 79. The fraud which vitiates must be by the holder of the mortgage and notes, 37 *Ga.*, 66–78 ; 48 *Ib.*, 156–162 ; 58 *Ib.*, 276. Duress makes contract voidable only, Story on Con., §98 ; 60 *Ga.*, 43 ; Chitty on Con., 194 ; Rescission must be total, 3 Starkie, 176 ; 3 East, 449 ; 41 *Ga.*, 171. As to duress, Code, §2595 ; 45 *Ga.*, 197 ; 36 *Ib.*, 179 ; 1st Harr. & Mc., 211.

P. W. Meldrim, for defendant, cited Code, §1793 ; Campbell & Jones *vs.* Murray *et al.*, 62 *Ga.*, 86.

Bleckley, Justice.

Hull held a mortgage upon certain property, real and personal, including a house and lot in the city of Savannah, executed to him by Mrs. Sullivan on February 28th, 1876, to

secure the payment of her five promissory notes of that
date, due at from one to five years thereafter, one each
year, and each for $1,400.00.  The first note having ma-
tured, he commenced proceedings in Chatham superior
court to foreclose the mortgage as to the house and lot in
Savannah, pending which Mrs. Sullivan filed her bill against
him, the substance of which may be condensed as follows :

Hull, the defendant, executed nominally to complainant
a deed of bargain and sale, whereby he pretended to con-
vey to her a tract of land in Liberty county, with a steam
saw-mill thereon, and other personalty, all fully described
in a copy of the deed annexed as an exhibit to the bill ;
and she, on the same day, executed to him the mortgage.
The contract for the purchase of the property embraced in
defendant's deed was made by complainant's husband, the
credit for the purchase money was extended to him ; the de-
fendant knew that complainant had no use for any of the
property ; the debt incurred for it was in truth a debt of her
husband ; the defendant never sold the property to com-
plainant, but, in order to secure himself for the debt of her
husband, he, through her husband, and under his influence, and
against her own wishes, persuaded and induced her to execute
the mortgage for the purpose of securing the husband's debt.
The property has been tendered back to the defendant, and
he has refused to accept it, but has foreclosed the mortgage
as to personalty, sold it out and bought it himself.  Certain
charges are made as to his non-residence, and the extent of
his resources within the jurisdiction of this state.  Discov-
ery is waived.  Injunction is prayed to restrain the present
foreclosure proceedings, etc., and a decree is prayed to cancel
the mortgage and the notes.  The bill was sworn to by Mrs.
Sullivan on the 7th of December, 1877.  The answer denies
that the sale was to Sullivan, that the credit was extended
to him, or that he created any debt of his own for the pro-
perty.  It alleges that the sale was made to the com-
plainant and upon the faith of her notes and mortgage.  It
denies that she was influenced by defendant, or that he had
any knowledge that she was influenced.

The two cases were tried together on the 25th of February, 1878. The deed, the mortgage and the notes, all of them of the same date, were in evidence. The deed conveys directly to Mrs. Sullivan, and warrants the title to her, her heirs, etc., against the claim of all persons whatsoever. It recites, as to the saw-mill and other personalty, that " the party of the first part doth also bargain, sell and *deliver* to the party of the second part." It was duly recorded on the 3d of April, 1876. The mortgage covers besides the house and lot in Savannah, the realty and the main bulk of the personalty embraced in the deed. It purports on its face to be for securing " the faithful payment of the debt which she justly owes to the party of the second part." After a brief description of the saw-mill tract in Liberty, it adds, " said tract of land being more fully described in a deed of the same from the party of the second part to the party of the first part, bearing even date herewith." The notes specify no particular consideration, but are for value received. Interest on each is payable annually. They are all payable at the office of Holcombe, Hull & Co.

The complainant and her husband testified in her behalf, and she introduced three letters addressed to him by the defendant. The evidence in behalf of the defendant was his own testimony and that of J. R. Saussy, Esq. All this testimony, so far as material to the main controversy, will now be recited.

Sullivan, examined by interrogatories, testified :

"I stopped at the mill for some two hours ; did not go for the purpose of purchasing it, but to see one of the employees ; in the course of conversation Hull stated he was going north ; I asked him why, if the mill was going to remain idle, he did not sell it ; he replied he would sell it ; I asked him what he would take for it ; he said $7,000, in seven years' time, with interest at seven per cent.; I told him I would take it, and he said he would come to town next day and fix up the papers. I met him the next day ; he asked me if I did not have some town property ; I told him that

I did not, that my wife owned a house in town ; he then asked me to give that house as additional security ; I told him that I would have to see my wife, as I did not know that I could. I then left him, he asking me to get my wife to give the house as security ; I agreed to see him the next day, and went home, where I used every entreaty and persuasion to induce my wife to give the house as security ; she refused, but finally consented, saying she would have to do so for peace' sake. That afternoon or the next day I saw Hull and told him that I had my wife's consent to her giving the house as security ; we agreed to go to Mr. Saussy, attorney at law, to prepare the papers ; Mr. Hull and Mr. Saussy had most of the conversation, and the latter made the remark, ' Well, we will make out the papers in her name.' We left him to prepare the papers ; he came to my house for my wife to sign them ; I had told her he would come to sign some papers ; he read the mortgage and she signed it ; the deed to the mill and land was not given to her ; it was never delivered to her, and she has never had it ; she knew nothing about the mill or its business, and was at the mill only during the prevalence of yellow fever in Savannah." Examined on the stand the same witness testified : "I stopped at the mill to see the foreman, and there I met Hull for the first time and had a conversation with him about the sale of the mill ; we appointed the next day to meet in Savannah to confer about it. We met accordingly and agreed upon terms, but he wanted more security, when I mentioned to him that my wife owned a house and lot in Savannah, upon which he replied that if she would secure him he would make the trade. I spoke to her about it, and she was at first unwilling to have anything to do with it, but, after much persuasion, consented. I told Mr. Saussy to draw the papers, and it was discussed in his office whether the deed should be made to her, and it was there decided that it should be made in her name ; I think the suggestion came from Mr. Hull ; I did not tell him that she was reluctant to enter into the arrange-

ment, nor did I tell him that she wished to buy his property. The contract was between him and myself; the debt for the purchase money was my debt and the mortgage on her property was intended to secure this debt. I transacted business [at the mill] as agent, but I really was agent for myself. I bought goods from Holcombe, Hull & Co., as agent. My wife had no knowledge of my agency." The complainant testified: "I did not wish my husband to buy the land and mill from Mr. Hull; he proposed that he would buy the property, and for me to give a mortgage upon it and the house and lot in Savannah; I was unwilling to do this, and avoided him all day so as to escape his persuasion, but towards evening he said he would make way with himself unless I consented, and I did then consent." The deed from Hull to witness was shown to her, upon which she said that "I never knew that there was such a deed until the Friday before the trial, when my attorney told me that there was. I never saw the deed until this moment. It was never delivered to me. My husband was not my agent, I knew of no agency, and nothing of the business in any shape or form; I did not understand the mortgage; I had promised my husband to sign the papers and I signed them. I never derived any benefit from the mill. I did not see Mr. Hull at all during the negotiations, and never until to-day; did not inform him I was unwilling to have anything to do with the business, not knowing where to find him. Mr. Saussy read the papers to me, but I did not understand them; after he read them I signed them. During the yellow fever of 1876 in Savannah, I went to Liberty county and lived on the land for about two months; the house was quite near the mill, and I knew the mill was being worked by my husband, and that he was cutting trees from the land, but did not know that he was carrying on the business as my agent." J. R. Saussy testified: "I was employed by Mr. Sullivan to draw the papers; he directed me to draw the deed to Mrs. Sullivan, and I did so; the conversation

which he mentioned as having taken place in my office, I do not think took place there ; I do not think my advice as an attorney was asked ; I acted as a scrivener ; they wanted a bill of sale and mortgage, and I drew them, then went with the notes and mortgage to Mrs. Sullivan's dwelling (Sullivan being along) to witness the execution ; when we got there, another witness to attest with me was sent for, and the delay was nearly half an hour, during which I remained in the house ; do not remember whether Mrs. Sullivan was present before the other witness came. I read the mortgage and notes over to her before she signed them, and I think she understood them ; she appeared to sign them reluctantly ; there was no haste about their execution ; witness had no reason to think she was signing against her will, and does not recollect whether the bill of sale was delivered to her or not." [Mr. Saussy is a subscribing witness to the instrument called in the record sometimes a deed and sometimes a bill of sale, as well as to the mortgage.] The defendant testified : "I never knew or heard, until she filed her bill, of any improper or undue influence being used to induce complainant to purchase the property. Mr. Sullivan told me that his wife wanted to buy the property, and that she had a house and lot in Savannah which she wanted to give as security ; I replied that if secure for the purchase money I would give any time. I did not direct Mr. Saussey to draw the deed to complainant, though I sold the land to her ; I gave the credit to her but did not see her then and never have seen her until to-day in court. Possession under the deed to complainant was given immediately upon the execution of this deed. Mr. Sullivan transacted business at the mill as agent. The letters from defendant to Sullivan were written at Oxford, N. Y., and the first is dated December 28th, 1876. It says, "I want to use some money the 1st of February, and would like to have you send me four or five hundred dollars. If you will send me $500 then, I will wait until April or May for $500 due on the 1st of March. I thought perhaps that ar-

rangement would suit you better than to make the whole pavment the first of March." The second letter is dated January 17th, 1877, and says: "I am very much disappointed that you cannot make the payment due March 1st. I have borrowed money and expected to pay with the money due from you. I sold you the mill without requiring the payment of a single cent at the time . . . gave you all the time you asked to pay for it . . . when you proposed to buy you offered to pay every three months . . . If you make no payment the 1st of March, when due, I shall be compelled to commence proceedings to foreclose the mortgage," etc. The third is dated March 13th, 1877, and says: "You bought my mill with your eyes open; as a practical miller and machinist you examined it . . . no other man would have sold you such property as I did without receiving a dollar for it. I gave you five years, your own time, to pay for it. After using it a year you don't even now propose to pay me a dollar. I cannot afford to give you $7,000.00 . . . I cannot let you wear out the mill and cut off all the timber, and then give me back the property with nothing," etc.

Certain questions were propounded by the court to the jury, in writing, in answer to which the jury found, that the mortgage as to the Savannah property was not given by the complainant freely, voluntarily and without any improper influence or duress; that the mortgage was given to secure the purchase money of property really bought for the use and benefit of complainant's husband; that the deed was not taken, and the mortgage as to the Savannah property was not given, by the complainant freely and voluntarily and with a design of effecting a change of her estate; that she did not receive the deed with the intention of owning and of constituting her husband her agent and trustee to run and manage the mill property for her; that if there was duress to induce complainant to sign the mortgage, the defendant did not have notice of it; and that the general result was a finding for the complainant. The defendant moved for a

new trial on several minor points, none of them vital to the merits, and on the ground that the verdict was contrary to law and evidence. The motion was overruled; and hence this writ of error.

1. This is a case which cannot be treated at long range, but must be engaged at close quarters. I have therefore reported both the pleadings and the evidence exhaustively, in everything essential. There is more apparent than real conflict in the evidence, though there is some real. When a few loose expressions are bandaged, and a few legal conclusions are cut away from the language of witnesses, where the naked facts ought to be kept uncovered, the conflict ceases to be material. There is scarcely any diversity in the testimony as to what was *actually done*; the variations relate to what was said, or else to the consequences of putting together the sayings and doings. That negotiations for the sale and purchase of the mill and other property commenced at the mill on one day and were concluded at Savannah on another; that they were conducted throughout by Hull and Sullivan, Mrs. Sullivan not being even seen by Hull or him by her; that Hull executed a conveyance directly to her, delivering it in her absence, and that it went to record in the second month after its execution; that she executed to him notes for the purchase money, and a mortgage to secure them, first hearing them read over; that these came to Hull's hands in pursuance of the purpose and intention of all the parties, and before he had let go his hold on his own property; and that Sullivan then took charge of that property, and conducted business nominally, at least, as agent, cannot be doubted. Hull says that Sullivan told him, at what stage of the negotiations does not appear, that his wife wanted to buy the property and give her house and lot for security. Sullivan denies this, but of what importance is the conflict? What telling was needed when she gave the only notes for the price that were given, executed the only mortgage, and took the only conveyance? She got title to Hull's property and bound

both that and her own, besides becoming generally liable on her notes, to pay for it; or at least Hull thought she did; then what telling did he need that she wanted to buy it? Her acts showed what she wanted to do ; after these acts, if he had gone away in any uncertainty as to her wishes, he would have been hard to convince.    The whole transaction was open and inconclusive until it took its final form ; and the shape into which it ultimately fell was that in which we now find it.    Sullivan gives two versions, apparently a little inconsistent, as to what occurred at the first interview —that at the mill.    In his examination by interrogatories, he states that Hull priced the property and named the terms of credit, and he said he would take it, Hull replying that he would come to town next day and fix up the papers. In his answers from the stand, he states that they had a conversation touching the sale, and appointed the next day to meet in Savannah to confer about it ; that they met accordingly and agreed upon terms, but Hull wanted more security, whereupon Sullivan mentioned that his wife had a house and lot in Savannah, and Hull said that if she would secure him he would make the trade.    Then, it seems, Sullivan repaired to his wife, and her participation in the business ensued.    Take either or both of Sullivan's versions, not by themselves but in connection with what was actually done, and consider the nature of the property which Hull was proposing to sell, that it was a steam sawmill, with machinery, timbered land, vehicles, teams for hauling, etc., consider also the term of credit, and that Hull was closing out to go north, and there is scarcely a doubt that the inability of Sullivan to give other security than upon the property itself, was the obstacle which prevented his becoming the actual purchaser, and that it caused him to induce his wife to take the bargain herself, Hull being willing to accept the security which she could give. He may not have explained to his wife so as to enable her to fully comprehend the transaction, and he may have been too urgent upon her to engage in it.    But it is not pre-

tended that either his reticence or his excessive zeal was
known to Hull.  A fair and probable inference from all
the evidence is, that Sullivan wished to buy the mill, etc.,
and after agreeing with Hull upon the price and other con-
ditions, proved unable to consummate the purchase on his
own account because the house and lot required as security
belonged to his wife ; thereupon, he induced his wife to be-
come the purchaser through him, and the contract, in this
shape, was consummated, the papers being drawn and exe-
cuted accordingly.   Hull does not testify that Sullivan told
him in the first instance that he wanted the property for
his wife ; he does not say when he told him, and we have
just seen that no express oral communication to that effect
was necessary.   When the papers were so drawn as to in-
vest her with the ownership, and she adopted them by exe-
cuting and delivering those of them which made her
answerable for the payment of the purchase money, one of
these latter reciting that the debt was hers, and that Hull
had sold and conveyed to her, she ratified the purchase as
her own, and it was the same as if she had negotiated in
person from the beginning.   The real light of the contract
shines in the papers deliberately prepared and executed
when Hull parted with his property and the debt for it was
created.   The rest of the evidence may obscure it somewhat,
but does not put it out.   It does not bring on night, but at
most only a cloudy day.   It is a fact of prime importance
that Hull was master of the situation, and remained so
until Mrs. Sullivan had, under her hand and seal, taken the
position of purchaser and owner.   Until then he had both
possession and title.   The deed to Mrs. Sullivan and the
mortgage from her were parts of one entire transaction, and
if one document had fallen through, so would the other.
If she had not accepted the property as her own, and mort-
gaged it, together with her house and lot, nothing had oc-
curred, or, so far as appears, ever would have occurred to
divest Hull of title or possession.   He could still have
kept his property, and neither Sullivan nor Mrs. Sullivan

could have hindered him. Why did she mortgage the property if it was not hers? By the very act of mortgaging it, she exercised over it the dominion of an owner, and estopped herself from denying her title to it without showing fraud. 46 Ga., 133 ; 58 *Ib.* 178. Unless, therefore, she has shown fraud, and fraud, too, with which Hull is chargeable, does not the estoppel, as matter of law, silence her? But coupled with her act of mortgaging are express words in the mortgage instrument, by which she declares that the debt to be secured is one which she justly owes to Hull ; and, moreover, that instrument recites that he has conveyed to her, for it mentions the very deed. This deed not only passes title to her, but it absolutely warrants that title against the world, Sullivan included. How, then, could the property be Sullivan's? and if the property was not his, how could the debt be his? Surely the debt, the only debt there was, was for the property ; the property was not sold twice, but once ; there was therefore but one debt for the price ; and it would seem that the person who owed that debt was the person to whom the property was conveyed and warranted, and who gave notes for the price, and secured those notes by a mortgage, and in the mortgage declared the debt to be one which she justly owed. Sullivan, it is true, swears that the debt was his, but in doing so he states a legal conclusion which the facts prove beyond doubt to be erroneous. Whether a given state of facts constitute a debt, and if so, who is the debtor, are both questions of law. It is manifest that, on the evidence as a whole, there was no actual debt created between Sullivan and Hull, and that if the latter had sued the former, the action could have been defeated upon the ground that Sullivan's share in the transaction was as agent for his wife. There is positively no indication of moment that the credit, or any part of it, was given to him, or that he incurred any personal liability to Hull. He gave no note or other promise, and the notes and mortgage of Mrs. Sullivan were, as the trade was finally closed up, all that Hull took in

place of his property.   The letters of Hull speak loosely of
the sale as to Sullivan, and the debt as his, and they urge
him to pay, but nothing is more clear than that the writer
is not referring to any sale other than the one evidenced
by his deed, or any debt other than that evidenced by the
notes and mortgage.   All his dealings with Mrs. Sulli-
van had been indirect, her husband standing forth in her
stead, and even, it may be, at the time the letters were
written, conducting business at the mill as agent.   It was
natural for Hull to treat him as her agent, and to expect
that he would be the channel of payment as he had been
that of purchase, and as he also seemed to be in respect to
use and management.   In this state of mind he looked, we
may be sure, at the wife and her husband somewhat as one
and the same person, and in some expressions wrote accord-
ingly.   It is not uncommon, in speaking or writing to a
known or a supposed agent or clerk, especially one that
seems to guide as well as serve the principal, and one with
whom the dealings in question have been had, to say "your
debt, your note, the sale I made to you, the sale you made
to me," and the like, where the reference is to business in
which the person addressed has acted, and is expected still
to act, only in a representative capacity.   To catch at Hull's
letters, and because of their literal bearing when looked at
apart from the more solemn papers in the case, make them
work his overthrow would, we think, be injustice.   If he
had been more guarded, or more full in descriptive terms,
his real meaning, no doubt, would have been better ex-
pressed, and he would have run much less hazard of mis-
construction.   We can imagine his own consternation and
the momentary perplexity of his counsel in pondering over
these letters when first they made their appearance in the
litigation.   By themselves the letters seem formidable, but
their true meaning is perfectly clear when they are read in
the light of the other documents and facts; and so to deal
with them is our duty.   If, indeed, we should take them in
literal strictness, they would not change the result; for if

Hull thought when he wrote them that Sullivan owed him for the property, and meant to say so in the sense of excluding agency for the wife, he was mistaken ; like Sullivan himself, he committed an error of law in drawing that conclusion. Taken at their true legal value, the facts of trade, title and security make Mrs. Sullivan the debtor, and the only debtor. Nothing but fraud committed by Hull, or by Sullivan with his knowledge, would relieve her.

2. Her testimony that she was ignorant that she was to be invested with title, and that she never knew of the deed until the Friday before the trial is of no avail. There is no charge in the bill that she did not know of the deed at the time of the main transaction, or that she did not know of it at any time. On the contrary, the first thing the bill does is to mention the deed, recite some of its contents, and refer to a copy of it annexed as an exhibit for the balance. She swore to the bill in December, and at the trial in February, forgetting, no doubt, that she had seen or heard of the deed before the previous week, she testified that not until the last Friday did she know there was such a deed. There is no occasion to put an uncharitable construction on this apparent inconsistency, and I have suggested failure of memory as the explanation ; there may be some other. But she was bound to take notice of the deed, for not only did she mortgage the property as owner, but her mortgage mentions the deed by way of recital. If she had not seen the deed she ought to have instituted inquiry. Delivery might be made to her husband or to another for her, and in point of fact it was made, for the deed was duly attested and went to record. She says she did not understand the mortgage when it was read to her ; but she was bound to understand it, or decline to execute it. There is no suggestion that she labored under any mental incapacity.

3. She says that she never derived any benefit from the mill, and that her husband was not her agent; and to the same effect is his testimony, with the addition that though he transacted business as agent, he was agent for himself,

and his wife had no knowledge of his agency. It was odd
that he conducted business as agent for himself, but many
singular things are explainable, and this may be.  Grant
that he was not her agent, and that she derived no benefit,
whose fault was it?  Surely not that of Hull.  Hull had
put the title in her and warranted it.  Neither he nor Sul-
livan could take it out of her without her consent, nor use
the property without the like consent.  She was mistress of
the title, and it was her province to see that she got the
use or the fruits of the use.  The law cast no duty in that
regard upon Hull.

4. As to duress and fraud there is no need of discussion.
The jury found that Hull had no notice of any duress, and
there is no notice of fraud established, much less the commis-
sion of any fraud on his part.  The bill, properly construed,
does not charge duress; nor on the theory on which it rests
was any duress, or fraud either, essential.  If, as the bill avers,
the mortgage was given to secure the husband's debt, that
was enough to render it void.  There is a glance at duress in
the evidence, but we need not say what its effect would have
been if Hull had been aware of all the facts.  Consult Ewell's
L. C. notes, pp. 772, 794.  It seems the evidence came in
without objection, but it may be questioned whether these
family conversations, if strictly private, especially where they
involve such a delicate and gory subject as a purpose and
threat by one of the conjugal pair to commit suicide, can be
heard to defeat a contract afterwards made with a third
person, the witness being none other than the husband or
wife.  40 *Ga.*, 150, 490; 60 *Ib.*, 512.  It strikes me that if
anything ought to be buried as a profound secret, such a
momentary exhibition of weakness, especially on the part
of the masculine consort, is that thing.  But we leave it as
a query.

5. The verdict takes a range somewhat wider than the
bill, and to that extent is of course to be disregarded.  For
instance, there is no suggestion in the bill that the property
was bought by Mrs. Sullivan for the use of her husband,

and not for her own use ; on the contrary, it sets up that she did not buy it at all; that the purchase was her husband's, not hers, and that the debt secured was his and not her own. We look at the issues made, and the evidence applicable to the same, and upon them we think the finding of the jury was contrary to law and evidence, and that there ought to be a new trial. To us it is obvious that the consideration moved to the complainant, that her husband acquired no title to or interest in the property, that he incurred no debt to Hull, and that the entire credit was given to the wife.

Judgment reversed.