### 1128. THIRD NATIONAL BANK OF COLUMBUS *v.* POE.

1. A married woman has power to contract as to her separate estate, subject only to the limitations, that she can make no contract of suretyship, she can not assume to, or pay to, a creditor of the husband a debt of the latter, she can not sell her separate estate to her husband without the consent of the superior court.

8

(a) In the absence of fraud or undue influence, she may give her property or money to her husband, in order that he may pay his debts; and in the case of a gift, the burden of showing fraud or undue influence is upon her.

(b) In the absence of fraud or collusion, she may borrow money or sell property (the husband's creditor not being the lender or purchaser, as the case may be) to get money to furnish to her husband, in order that he may pay his debts, notwithstanding the lender or purchaser knows the purpose.

(c) She may legally procure a third person to pay the debt of her husband, and will be bound by her contract to reimburse him in so doing.

2. Where a husband who is a customer of a bank, and who is indebted to it by a past-due note, brings into the bank the cashier's check of another bank, payable to his order, indorses it, places it to his deposit account, and gives his personal check thereon in settlement of his note due the bank, the bank, in the absence of mala fides, is not subject to an action by his wife to recover the value of the cashier's check, although it was obtained with her money, and although the bank so accepting it has cause to suspect that the wife was in some way instrumental in procuring it for the husband.

(a) The purchaser for value of a commercial paper who takes it from the apparent owner acquires a good title as against an undisclosed true owner, in the absence of mala fides. Mere want of such caution in the purchaser as ordinarily prudent men usually exercise in other transactions is not sufficient to defeat his title.

(b) Ordinarily, where commercial paper is offered in the usual course of business, the purchaser need not make inquiry as to the ownership, when the transaction appears regular on its face.

(c) If the purchaser knows or has reasonable cause to believe that the apparent owner is not the true owner, and enters into privity or participation in the fraud upon the true title, his title is defeasible.

(d) There is a marked difference between "reasonable cause to believe" and "reasonable cause to suspect."

(e) The verdict in the case at bar is without evidence to support it.

Complaint, from city court of Columbus—Judge Willis. April 4, 1908.

Argued June 11,—Decided November 10, 1908.

To boil down the testimony and to give the defendant in error the benefit of doubtful issues of fact, it may be stated in general terms that Captain Poe, the husband of the defendant in error, owed the bank a past-due note for $5,000; the bank was peremptorily demanding payment, suspecting him to be insolvent; Captain Poe and his wife, for reasons which it is not necessary to mention, were extremely anxious that it should be paid, and that the bank should not take action. The cashier of the bank came to the Poe residence on May 11, which was Saturday, and

made final demand. Poe had about $600 in the bank to his credit, and he gave a check for this sum, to be placed upon the note. Mrs. Poe had about $200 in the savings department, and she insisted on giving this to be paid on the note, and the cashier took her check for it; but this $200 is not involved here now. She said she would give her home and a legacy she was expecting soon, if the bank would not close Captain Poe out. The cashier told Captain Poe that if the balance were not paid at once, the bank would take action on the note, which was secured by the transfer of a large number of cotton receipts. After the cashier left the house, Mrs. Poe sent for a Mr. Bowers, who was a friend of the family. She stated to him that they were under the necessity of paying to the bank $5,000 at once, to prevent Captain Poe's business being closed out. Mrs. Poe told him she desired to mortgage to him her home for the sum of $5,000, to raise the money. Bowers undertook to arrange it for her. After trying to borrow the money for her elsewhere, he went to see Mr. Bradley, who was the active vice-president in charge of the affairs of the bank, party plaintiff in error herein. He asked Mr. Bradley if he knew of any reason why he (Bowers) should not lend Mrs. Poe $5,000. Mr. Bradley said he did not. Bowers then asked Bradley if he knew Captain Poe's financial condition; to which the latter replied that he did not. He then asked why the bank was pressing for the $5,000 to be paid that day—why so short a time was given. Bradley replied that he was willing to give him a day or two. Bowers told him that Mrs. Poe had applied to him for the loan of $5,000, that it would take till Monday to fix the papers, but that if the bank would await action until Tuesday, he would see that the debt was paid. Bradley replied that if he (Bowers) would go by the bank and guarantee payment of the paper, the bank would not press it prior to Tuesday. Bowers went by the bank and made the guarantee. He then went to the Merchants & Mechanics Bank in the same city and made a personal arrangement by which the sum of $5,000 was placed to his credit. He prepared a note and mortgage payable from Mrs. Poe to himself, for $5,000, and Mrs. Poe duly executed them. He then made out his check on the Merchants & Mechanics Bank, payable to Mrs. Poe, for the $5,000, and gave it to Captain Poe with directions that he have Mrs. Poe to indorse

it. She indorsed it in blank and sent it back to Bowers. She had instructed Bowers to get the money on it and pay the note at the Third National Bank; so he took the check, thus indorsed by Mrs. Poe, to the Merchants & Mechanics Bank, indorsed it himself, and asked for the cash on it. As to this Bowers testified: "I went there to get the money on the check, to pay the debt I promised to pay to Mr. Bradley." The cashier of the Merchants & Mechanics Bank asked him to take a cashier's check for the money, instead of the cash. He agreed to do so, and asked the cashier to make the check payable to Captain Poe; and this was done. Bowers took this cashier's check to Captain Poe, who carried it to the Third National Bank, indorsed it, made out a deposit ticket, and deposited it to his credit on his individual account, at the teller's window, and then gave the cashier a check on his account for the balance due on the note, which was marked "paid," and was surrendered, together with the collaterals which had secured it. The cashier testified, that in taking the money in payment of the note, he did not know that Mrs. Poe had anything to do with it, or that it was her money; that he supposed that Captain Poe, probably though the assistance of Mr. Bowers, had obtained a loan from the Merchants & Mechanics Bank; that he made no inquiry; that he had received instructions from Mr. Bradley, the vice-president, not to accept payment of the debt from Mrs. Poe; that if he had known or believed it was Mrs. Poe's money, he would not have accepted it. Mr. Bradley, the vice-president, testified to substantially the same thing, except that he was not present when the note was paid, but learned of the payment later in the day. Mrs. Poe thereafter filed an action against the bank to recover this $5,000. The petition alleges that at the time the bank received the $5,000 from Captain Poe, it knew that it was not his money, but was the money of the separate estate of petitioner. The jury returned a verdict in her favor for the full amount claimed.

*Garrard & Garrard, W. Cecil Neill, Goetchius & Chappell, W. A. Little,* for plaintiff in error.

*Samuel B. Hatcher, Charlton E. Battle,* contra.

POWELL, J. (After stating the foregoing facts.)

1. A married woman, who, to trace her ascent in the social scale according to the observation of a noted French anthropolo-

gist of the last generation, was "first a beast of burden, then a do-
mestic animal, then a slave, then a servant, and then a minor,"
is now, according to our law, a free trader, subject only to three
express exceptions: She can not bind her separate estate by any
contract of suretyship; she can not assume to, or pay to, the cred-
itor a debt of her husband; she can not sell her separate estate
(property or money) to her husband, without the consent of the
superior court. *Farmers & Traders Bank* v. *Eubanks,* 2 *Ga. App.*
839 (59 S. E. 193); *White* v. *Stocker,* 85 *Ga.* 200 (11 S. E. 604).
She may give her property or money to her husband that he may
pay his debts with it, in the absence of fraud; and where a gift
is shown, the burden of proving fraud is on her. Civil Code,
§2491; *Cain* v. *Ligon,* 71 *Ga.* 692 (51 Am. R. 281); *Hadden* v.
*Larned,* 87 *Ga.* 634 (13 S. E. 806). She may borrow money to
be used by her husband to pay his debts, provided the husband's
creditor is not the lender. *White* v. *Stocker,* supra; *McCrory* v.
*Grandy,* 92 *Ga.* 327 (18 S. E. 65); *Johnson* v. *Leffler,* 122 *Ga.*
670 (50 S. E. 488); *Nelms* v. *Keller,* 103 *Ga.* 745 (30 S. E. 572);
*Chastain* v. *Peak,* 111 *Ga.* 889 (36 S. E. 967). The fact that
it is to the lender's interest that the wife should borrow the money
from him, to furnish it to her husband to pay his debts, makes
the wife's contract with the lender no less valid. *Rood* v. *Wright,*
124 *Ga.* 849 (53 S. E. 390). She may sell her property to get
money to pay her husband's debt, and the purchaser, if he is not
the husband's creditor, gets a good title, though he knows of the
purpose. *Skinner* v. *Braswell,* 126 *Ga.* 761 (55 S. E. 914). She
may legally procure a third person to pay the debt of her husband,
and will be bound by her contract to reimburse him for so doing.
*Hill* v. *Cooley,* 112 *Ga.* 116 (37 S. E. 109). We have stated
these preliminary propositions so that it may be seen how broad
are a married woman's powers of contracting, even as to matters
affecting her husband's debts.

2. The present suit is but a form of the common-law action
for money had and received. The substance of the petition and
the gist of the action is that the bank received for its use and
benefit $5,000 which in equity and good conscience belonged to
the plaintiff. Her petition, as construed in the light of the proof,
asserts that the bank allowed her husband to deliver to it the
cashier's check which was payable to him, but which was really

hers, and to direct its appropriation to a purpose forbidden by law; that her husband held the check as her depository or agent —in a fiduciary relationship—and that the bank colluded with him to break his trust, to its benefit and to her detriment. Cf. *Moye* v. *Waters,* 51 *Ga.* 13. It becomes pertinent to inquire, therefore, whether such an action can be maintained when the husband's creditor has received in payment of his pre-existing debt a negotiable bill, standing in his name but really the property of the wife; and, if so, upon what conditions. In the leading case of *Humphrey* v. *Copeland,* 54 *Ga.* 543, it is held that "a creditor who receives in payment money belonging to his debtor's wife, knowing it to be her separate estate, acquires no title to it, as against her, whether she consent to the payment or not. The code, in declaring a sale void when made by the wife to a creditor of the husband in payment of his debt, comprehends, in its reason and spirit, a transaction in money, as well as a transaction in property. Without notice of the wife's ownership, a creditor receiving money is protected, and the burden of proving notice is upon her." In the body of the opinion (p. 548) Judge Bleckley says: "In ruling, as we have felt bound to do, that married women can repudiate their consent, whether express or implied, to the use of their money in transactions with their husbands, or in payment to their husband's creditors, we do not mean to say that wives are tolerated by the law in combining with their husbands to commit fraud on other people. It is only where *notice* is brought home that a wife's rights will be saved. The burden of proof is upon her, for in every case where money is received and value given, there is a presumption that title passes, which stands until it is rebutted by evidence. And the measure of evidence should not be too scant in mere deference to sex. When man and wife co-operate for good they can do much good; and so, when they combine against third persons and co-operate for evil, they can do much harm. In protecting women, courts and juries should be careful to protect men, too, for men are not only useful in general society, but to women especially." It appears therefore that such an action may be maintained if the husband's creditor received the money with notice of the wife's title to it. In the present case the property received was a negotiable instrument; the question, therefore, resolves itself into the more imme-

diate inquiry, what degree of notice is necessary, to impeach the title of one who has taken a negotiable instrument from the holder thereof, when the instrument in fact belongs to another? This court considered that question in the case of *Walden* v. *Downing Co.*, 4 *Ga. App.* 534 (61 S. E. 1127). It will be seen, by reference to that case and the authorities therein cited, that one who takes a negotiable instrument as a purchaser for value (and in the payment of a pre-existing debt there is a transfer for value) from the apparent owner' gets a good title as against the true owner, unless he takes it mala fide; that "such title is not defeated, by the want of such caution in the purchase as a careful and prudent man would exercise in the conduct of his affairs, or by gross negligence;" that "mala fides consists in notice, actual or constructive, of the fact that the security [the negotiable instrument] is not the property of the person who offers it, *and* a privity with or participation in a fraud upon the true owner." It will be seen, by reference to the cases of *Matthews* v. *Poythress*, 4 *Ga.* 287, and Shaw *v.* R. Co., 101 U. S. 564 (25 L. ed. 892), cited in *Walden* v. *Downing Co.*, supra, that the taker of the negotiable instrument is not usually charged with any duty of inquiry by which he would become chargeable with notice of those facts to which such inquiry would lead. The case of *Matthews* v. *Poythress*, supra, is also cited as authority for the ruling in the case of *Moye* v. *Waters*, 51 *Ga.* 13, in which the creditor took from the husband a promissory note payable to the wife or bearer.

In the light of the generality of the principle that one may take a negotiable instrument freely from the apparent true holder, there seems to be no reason for restricting it in case the husband is the transferrer and the wife the undisclosed true owner. Such cases seem to follow the general rules of jurisprudence. Note the opening statement in the first division of the opinion in the case of *Humphrey* v. *Copeland*, supra (p. 545) ; see also *Gorman* v. *Wood*, 68 *Ga.* 527. We find no Georgia case to the contrary. The cases cited by counsel for the defendant in error easily distinguish themselves. In *Chappell* v. *Boyd*, 61 *Ga.* 662, *Bank* v. *Bell*, 65 *Ga.* 528, *Lewis* v. *Howell*, 98 *Ga.* 428 (25 S. E. 504); *Grant* v. *Miller*, 107 *Ga.* 804 (33 S. E. 671), and *Rogers* v. *McClure*, 128 *Ga.* 393 (57 S. E. 692), the husband's creditor had actual notice of the wife's title. In *Klink* v. *Boland*, 72 *Ga.* 493, and *Love* v.

*Lamar,* 78 *Ga.* 327 (3 S. E. 390), the husband and his creditor were guilty of collusion and fraud against her. In *Chason* v. *Anderson,* 119 *Ga.* 497 (46 S. E. 629), it is said that "unless Chason [the husband's creditor] *knew* the money belonged to Feriba Anderson [the wife], he had a right to presume that it was Mason Anderson's [the husband's], and to apply it to his debt." In *Hull* v. *Sullivan,* 63 *Ga.* 139, some of the statements of the court are very strong: "Nothing but fraud committed by Hull [the creditor], or by Sullivan [the husband] with his knowledge, would relieve her [the wife]. . . She was mistress of the title, and it was her province to see that she got the use or the fruits of the use. The law cast no duty in that respect upon Hull."

It is true that in *Humphrey* v. *Copeland,* supra, Judge Bleckley says, "If at that time he [the creditor] knew or had reasonable cause to believe it was her money, and it was in fact hers, that was enough;" but in the light of the whole discussion in the case it is plain that there was no intention of using the phrase "reasonable cause to believe," in any other sense than as equivalent to that constructive knowledge which amounts in substance to actual knowledge, and not as the equivalent of the expression "with notice," which, by construction, usually means and includes all facts discoverable by reasonable inquiry. A fair example of such constructive knowledge is found in the case of *Bank* v. *Bell,* 65 *Ga.* 528. There a note payable jointly to the husband and wife or bearer was placed in the bank for collection; the bank collected it and placed its proceeds, by the husband's direction, to the payment of one of his debts; the bank had actual knowledge that the note was given in payment for lands of the wife, and that the note was hers; it was held that on account of the actual knowledge of the ownership of the note, the bank had constructive knowledge of the ownership of the proceeds of the note which it itself had collected.

If we give to the expression "reasonable cause to believe," found in Judge Bleckley's opinion in the *Humphrey* case, supra, the same meaning it has been given by the Supreme Court of the United States in constructing the national bankruptcy act, we shall see how much it lacks of sustaining the wife's action in the present instance. See Stucky *v.* Masonic Bank, 108 U. S. 74 (27 L. ed. 640), and Grant *v.* National Bank, 97 U. S. 80 (24 L. ed.

971). By these cases it is made plain that "reasonable cause to believe" differs much from reasonable cause to suspect.

There is a difference, as to the duty of inquiry, where the subject-matter of the transaction is a negotiable instrument offered in the ordinary course of business, and where the subject-matter is property of another character. It would seriously embarrass business, especially the business of banking, if commercial paper could not be taken without inquiry as to its title, in the absence of more than a mere suspicion. Take the present case, it certainly can not be claimed that the bank was in any privity or collusion with the husband or any one else to induce the wife to pay her husband's debt; the agents in charge of the bank were expressly instructed not to allow her to do so; a solvent friend had guaranteed that the debt would be paid on the very day it was paid; it was perfectly legal for that friend to pay the debt or to furnish the husband with money with which to pay it, and even for the wife to agree to reimburse him if he would so furnish it (see *Hill* v. *Cooley,* 112 *Ga.* 116, 37 S. E. 109); the husband came into the bank with the cashier's check of another bank, payable to the husband and indorsed by him, and suggesting no connection of the wife with it, and offered that check for credit to his deposit account and ultimate payment on his note; was it the duty of the teller or the cashier to inquire of him, "Is this your wife's money?" Is it in accordance with the usage of bank officers to inquire of their customers as to their private transactions,—as to where they get the money or checks they offer for deposit, where they appear regular on their face? If such an inquiry had been made, Captain Poe might justly have resented it as an act of impertinence. If he had replied merely according to his knowledge, and not also according to his inferences and suspicions, he would have said, "I got it from my friend Bowers." Was it the duty of the cashier or the teller, before they received the check, to go to the Merchants & Mechanics Bank and ask, "Where did Captain Poe get the check? Whose money is it?" The officials of that bank would properly have replied, "We do not recognize your right to ask such questions. Banks do not make a practice of divulging the private business affairs of their customers transacted through them."

The bank may have suspected that somehow or in some way Mrs.

Poe had assisted in procuring the check that Captain Poe had presented; but her mere assistance in procuring the money would. not have prevented the bank from legally accepting it. It is shown, by the cases cited in the first division of this opinion, that there are several ways in which she might legally have enabled him to get the money with which to pay the bank's debt. Therefore, even conceding that the cashier's check was really Mrs. Poe's, it seems plain to us that, in the light of the presumptions the bank was authorized to indulge, she did not carry the burden resting on her of showing that the officers of the bank, at the time they took the check from Captain Poe, knew it was hers or that they had reasonable cause to believe (not merely suspect) that which it was necessary the bank should have had reasonable cause to believe in order to allow her to recover, namely, that the check was not Captain Poe's, that it was not Bowers's, that it was still hers, that she had not given it to Captain Poe.

This view of the case disposes of it without reference to many other questions presented. Indeed, we are strongly impressed with the view that the check was not her property at all, in legal contemplation; that, legally tested, the transaction necessarily shows that Bowers furnished the money at her instance and that she had no title, legal or equitable, to the check; but we have not developed that proposition; for what we have said above seems to make a final determination of the matter. Her case necessarily rested solely upon the proposition that the bank received a commercial paper belonging to her, under such circumstances that she could recover its value in an action for money had and received. Her right to recover could not be based on the other proposition—and the two propositions are sometimes confused—that the transaction amounted to a sale of her separate estate, made to a creditor of her husband in extinguishment of his debt, in violation of section 2488 of the Civil Code; for, although money delivered by the wife to the creditor has been held to be within the spirit and scope of this provision, the sale, actual or implied, which is an essential element is a form of contract, and every contract requires mutuality of consent; and it is plain that even though she may have intended to transfer or sell this money or commercial paper to the bank in payment of her husband's debt, it was never the bank's intention to deal with her in the transaction by

receiving it from her. Cf. *Cason* v. *Heath, 86 Ga.* 439 (12 S.
E. 678). A close comparison of the facts of this case with those
of *Walden* v. *Downing Co.,* supra, will show that the principles.
announced in that case control the one at bar.

*Judgment reversed.*